# EXHIBIT A

# United States District Court

_____ SOUTHERN _____  DISTRICT OF _____ NEW YORK _____

FULL CREATIVE, LTD. d/b/a I.C.B. ASIA, CO.,
LTD.

                Plaintiff,

          **V.**

SOLE CITY, INC., SOLOMON SAFDEYE, ALAN
KANDALL, JEFFREY BERNSTEIN and MARC
DOLCE

                Defendants.

## SUMMONS IN A CIVIL CASE

CASE NUMBER:

# 04 CV 02907

## JUDGE HOLWELL

**TO:** (Name and address of defendant)

Solomon Safdeye
141 West 36th Street
New York, NY 10018

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Gursky & Partners, LLP
1350 Broadway, 11th Floor
New York, New York 10018

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

_____
CLERK

*Jessica Doss*

_____
(BY) DEPUTY CLERK

APR 1 5 2004

_____
DATE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

FULL CREATIVE, LTD. d/b/a I.C.B.                    :        Civil Action No.
ASIA, CO., LTD.                                     :
                                                    :
                        Plaintiff,                  :
                                                    :
            -against-                               :        **COMPLAINT**
                                                    :
                                                    :
SOLE CITY, INC., SOLOMON SAFDEYE,                   :        **PLAINTIFF DEMANDS**
ALAN KANDALL, JEFFREY BERNSTEIN and                :        **TRIAL BY JURY**
MARC DOLCE                                          :
                                                    :
                        Defendants.                 :
-------------------------------------------------------------------x

Plaintiff Full Creative, Ltd. d/b/a I.C.B. Asia, Co. Ltd. ("ICB Asia"), by its attorneys

Gursky & Partners, LLP, for its Complaint against Defendants Sole City, Inc. ("Sole City"),

Solomon Safdeye ("Safdeye"), Alan Kandall ("Kandall"), Jeffrey Bernstein ("Bernstein") and

Mark Dolce ("Dolce"), alleges on knowledge as to its own acts and otherwise on information and

belief as follows:

## NATURE OF THE ACTION

1.      In this action Plaintiff asserts claims for breach of contract, accounts stated, fraud,

negligent misrepresentation and unjust enrichment in violation of, and pursuant to, the laws of

the State of New York.  Plaintiff's claims arise out of Defendants' wrongful conduct in (i) failing

to pay Plaintiff more than $1,400,000 for goods ordered and accepted by Sole City, and (ii)

making material misrepresentations to Plaintiff which were intended to, and did, induce Plaintiff

to forestall action to collect the monies owed it by Sole City and to continue delivering goods to

Sole City for which Sole City had no intention of paying, which was done for the benefit of all Defendants.

2.    To date, Defendants debt to Plaintiff exceeds $1,400,000.

## JURISDICTION AND VENUE

3.    This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4.    Venue is properly founded in this district pursuant to 28 U.S.C. §§ 1391 (a)(1) and (2).

## THE PARTIES

5.    Plaintiff is a Taiwanese corporation with its principal place of business at 20th Floor, #201, Sec. 1, Chung Kang Road, Taichung, Taiwan. Plaintiff is in the business of manufacturing branded footwear.

6.    Defendant Sole City is a Delaware corporation with its principal place of business at 141 West 36th Street, New York, NY 10018. Sole City is engaged in the business of manufacturing and selling branded footwear to national and regional retailers throughout the United States and Canada.

7.    Defendant Solomon Safdeye ("Safdeye") is an individual domiciled in the State of New York, whose business address is 141 West 36th Street, New York, NY 10018. Safdeye is President and sole shareholder of Defendant Sole City and dominates and controls all of Sole City's business activities, including the business activities hereinafter alleged. Safdeye personally participated in the wrongful acts alleged herein.

2

8.      Defendant Kandall is an individual domiciled in the State of New York, whose business address is 141 West 36th Street, New York, NY 10018. Kandall is the Chief Financial Officer of Sole City and personally participated in the wrongful acts alleged herein.

9.      Defendant Bernstein is an individual domiciled in the State of New York, whose business address is 141 West 36th Street, New York, NY 10018. Bernstein is the Chief Operating Officer of Sole City and personally participated in the wrongful acts alleged herein.

10.      Defendant Dolce is an individual domiciled in the State of New York residing at 82 Halpin Avenue, Staten Island, NY 10312. Dolce is a former employee of Sole City and personally participated in the wrongful acts alleged herein.

## BACKGROUND

11.      Plaintiff is the exclusive manufacturing agent for Innovative Custom Brands, International ("ICB US") (Plaintiff and ICB US are collectively referred to as "ICB"). ICB US also acts as Plaintiff's agent in the United States.

12.      ICB US designs, manufactures and sells footwear bearing various trademarks owned by third parties, including footwear bearing numerous internationally recognized brands. In addition, ICB US owns the word mark TROOP and various stylized marks incorporating the TROOP mark (collectively the "TROOP Trademarks"). The TROOP Trademarks include Registered Trademark Nos. 2,022,078 and 1,534,395, and are valid, subsisting, and in full force and effect. Registered Trademark No. 1,534,395 has achieved incontestable status pursuant to 15 U.S.C. § 1065. ICB US and its predecessor trademark owners have been marketing products bearing the TROOP Trademarks since 1986.

13.      Pursuant to a License Agreement dated, September 1, 2002 (the "TROOP License"), ICB US granted Defendant Sole City an exclusive right to market, sell, and distribute

3

footwear bearing the TROOP Trademarks in the United States (the "Licensed Products"). Under the terms of the TROOP License, Sole City (i) agreed to pay ICB US a royalty equal to the greater of 6% of actual net sales or certain specified minimum royalties; and (ii) was permitted to sell Licensed Products only to better quality retailers, and not to mass market or discount retailers.

14.    In addition, Sole City was obligated to purchase all Licensed Products from ICB US or its designee. Consistent with ICB US's practice, Plaintiff was ICB US's designee to manufacture all Licensed Products pursuant to the TROOP License.

15.    In or about March 2003, Sole City began ordering Licensed Products from Plaintiff. A Purchase Order and an Invoice was issued for each order shipped, and payment for the goods was due 90 days after shipment.

16.    Between March and December 2003, Sole City ordered and accepted delivery of approximately 110,000 pairs of Licensed Product having an invoice value in excess of $1,700,000. To date, Plaintiff is owed approximately $1,300,000 for Licensed Products ordered and accepted by Sole City, plus more than $60,000 for sample and production molds Plaintiff manufactured at Defendants' behest.

## FRAUDULENT PROMISES TO PAY

17.    By late September 2003, Defendants had ordered and accepted delivery of Licensed Products having an invoice value of more than $800,000, but had only paid for a small portion of those goods. Thus, in late September, Plaintiff began to make repeated requests of Defendants for payment of the outstanding invoices.

18.    On or about October 14, Randy Scurlock ("Scurlock"), an employee of ICB US, met with Kandall at Sole City's offices to discuss the outstanding invoices on Plaintiff's behalf.

4

During the meeting, Scurlock expressed Plaintiff's concern that Defendants continued to order and accept delivery of quantities of Licensed Products from Plaintiff, but persistently failed to pay for the goods.

19.     Kandall falsely assured Scurlock that Sole City would pay what it owed, and told Scurlock that he was working with Sole City's bank to secure financing to pay Plaintiff's outstanding invoices.

20.     One week later, on or about October 21, during a business trip to Hong Kong, Safdeye spoke with Plaintiff's President Daniel Chen ("Chen") about the outstanding amounts Defendants owed Plaintiff.  During that conversation, Safdeye acknowledged Sole City's debt to Plaintiff, and falsely promised Chen that Sole City would pay Plaintiff $200,000 on November 15, 2003, and continue to pay $200,000 per month thereafter until the entire outstanding balance was satisfied.  Chen told Safdeye that Sole City's failure to pay the past due amounts in accordance with the parties' contract would have a significant adverse affect on Plaintiff's cash flow.

21.     Relying on the representations made in October by Safdeye and Kandall that Sole City was securing funding and would pay Plaintiff $200,000 per month until its debt was satisfied, Plaintiff forestalled action to collect the debt owed it, and continued to ship goods to Sole City.

22.     On or about November 6 or 7, Kandall falsely represented to the president of ICB US, Mike Featherstone ("Featherston"), and Dennis Ryan ("Ryan"), another ICB executive, that Sole City did not have the necessary funds to make the payments promised by Safdeye on October 21.

5

23.    In actuality, Sole City had available funds, which Defendants expended to commence operation of a new apparel division at Sole City and to pay for substantial personal expenses of Safdeye and his family members.

24.    On November 11, 2003, in order to ameliorate Plaintiffs concerns about growing balances due and defraud Plaintiff into deferring collection action, Kandall presented Scurlock with another bogus payment plan. This time, Kandall falsely told Scurlock, among other things, that Sole City would sell the Licensed Products "in the normal course of business and not dump them in the market" and use the proceeds to make substantial monthly payments to Plaintiff beginning on November 20 and continuing, until the entire outstanding amount was paid in May 20, 2004

25.    During a meeting attended by Safdeye, Featherston, and Ryan on or about December 3, 2003, Safdeye falsely represented that Sole City did not have the money to make the payments proposed by Kandall on November 11.

26.    In fact, Defendants' never intended to adhere to the payment schedule proffered on November 11, 2003, and in furtherance of their ongoing fraudulent scheme to forestall Plaintiff's collection efforts, Defendants continued throughout the month of December 2003 to present ICB with one fraudulent proposal after another as to how and when the debt to Plaintiff would be paid.

27.    For example, during the December 3, 2003 meeting with Featherston and Ryan, Safdeye proposed a fraudulent scheme whereby Sole City's Korean partner would open a $200,000 letter of credit with a Chinese bank, and ICB would have a Chinese shoe factory fabricate invoices for bogus production which could then be presented to the bank for collection pursuant to the newly opened letter of credit. ICB declined to participate in this fraud.

6

28.      On or about December 5, 2003, Kandall tendered yet another phony payment plan, in which he misrepresented to ICB that Sole City would sell $700,000 worth of Licensed Product it had in its inventory and pay the entire proceeds to Plaintiff to reduce the debt.  By mid-December, however, Kandall reneged on this plan, with the excuse that Sole City's bank would not permit the sale of proceeds to be disbursed to Plaintiff because of Sole City's purportedly poor financial condition.

29.      During the third week of December 2003, as ICB continued to press for payment, Bernstein and Kandall again misrepresented to Featherston that Sole City lacked the funds to pay Plaintiff's invoices, but assured Featherston that Safdeye was going to pledge one of his two houses as security to finance the payment of Sole City's debt.  This representation concerning Defendants' intent to pay the money, like the many that preceded it, was false when made: Kandall and Bernstein were aware that Safdeye had no intention of financing the payment of Plaintiff's debt, by using his house as security or otherwise.

30.      During another meeting later in December 2003, Bernstein and Kandall presented yet another fraudulent payment schedule to Featherston, pursuant to which Sole City would begin paying Plaintiff a minimum of $100,000 per month in January 2004.  Although Sole City paid Plaintiff $50,000 in mid-January, and another $50,000 in mid-February, when pushed in late February for the second $100,000 payment, Safdeye and Kandall again falsely represented to ICB that Sole City lacked the financial wherewithal to make any further payments.  Thereafter, no further payments were made.

31.      While awaiting the $100,000 monthly payments promised by Kandall and Bernstein, in reliance on Defendants' representations that Sole City would pay Plaintiff $100,000 per month until the debt was paid, Plaintiff secured bank financing to fund its working capital

7

needs. But for Sole City's failure to pay for the Licensed Products ordered and accepted, Plaintiff would have had sufficient working capital and would not have had to finance its operations.

32.    The repeated representations by Safdeye, Kandall and Bernstein that Sole City lacked the financial means to pay for the Licensed Product were false and misleading. For example, during the latter part of November 2003, a large national retail chain (FootAction) had not only sent Sole City a substantial payment for Licensed Product delivered to it, but FootAction also had returned to Sole City the goods it had paid for, thus providing Sole City with both the cash to pay Plaintiff for those goods and the opportunity to resell the same inventory for still additional profits which could also have been paid to Plaintiff. None of the proceeds from the sale of the FootAction goods, however, were paid to Plaintiff.

33.    In addition, during this same period, Defendants expended considerable funds planning and opening a new apparel division, embarking on new ventures to design manufacture and sell apparel under several trademarks, including "School of Hard Knocks" and "Legends", hiring new executives, and exhibiting and promoting Sole City's new apparel lines at the "MAGIC Show", a large trade show.

34.    Each and every representation made by Defendants between September 2003 and March 2004 that Sole City would pay its debt to Plaintiff, including the specific representations made by Safdeye, Kandall and Bernstein set forth above, were false when made. Defendants made repeated false promises to pay and repeatedly misrepresented Sole City's financial condition with the specific intent of inducing Plaintiff to forestall all action to collect the debt owed to it by Sole City and to continue to supply Sole City with Licensed Products.

8

35.    During January and February, and the early weeks of March 2004, Plaintiff repeatedly demanded payment from Sole City, verbally and in writing.  Defendants continued to acknowledge the debt and assure Plaintiff that they intended to pay, but repeatedly misrepresented that Sole City did not have the money to do so and did not know when it would.

36.    On March 12, 2004, Plaintiff sent a letter to Defendants demanding payment of all outstanding debts.  While Defendants have admitted the validity of the amounts due to Plaintiff, Defendants have ignored Plaintiff's demand and have persisted in their refusal to pay any portion of the outstanding debts.

### THE LUDACRIS CONTRACT

37.    In or about early September 2003, Defendants advised ICB that Sole City had entered into an agreement with the popular rap artist "Ludacris" for the use of the Ludacris name on TROOP branded footwear (the "Ludacris Project").

38.    Defendants induced ICB to financially support the Ludacris Project by misrepresenting to ICB (a) that the Ludacris name was to be used exclusively on the Licensed Product (i.e., TROOP branded footwear) and in connection with the TROOP brand; and (b) that Defendants intended to work jointly and cooperatively with ICB to design and promote the new products.

39.    In a letter agreement, dated September 16, 2003, Safdeye reaffirmed Defendants' agreements (i) to work jointly with ICB to design and promote the new TROOP/Ludacris products, and (ii) that no commitments with respect to the Ludacris Project would be made without ICB's prior consent.

40.    In late September 2003, in reliance on Defendants' representations, ICB US delivered a check to Defendants in the amount of $62,500, representing fifty percent of the

9

Ludacris signing bonus. In a letter dated September 30, 2003, confirming receipt of the money, Kandall expressly reiterated Defendants' earlier misrepresentations to ICB that the Ludacris Project was to involve "the promotion of footwear bearing the Ludacris name by Troop".

41.     Defendant Dolce, Sole City's senior designer, was responsible for developing the new Ludacris footwear line. From the time the Ludacris contract was executed, through sometime in mid-October 2003, Dolce worked with Scurlock on a daily basis, frequently meeting at Sole City's offices. During this period, Dolce and Scurlock, among other things, reviewed and revised footwear designs, made plans to travel overseas together to set up the manufacture of the product, and worked together on marketing and advertising plans.

42.     In reliance on the repeated false representations by each of the Defendants, including Dolce, that the Ludacris brand would be used exclusively on and in connection with Licensed Product, ICB expended significant resources working with Defendants to design the new product line and plan its promotion. Plaintiff also expended significant resources to design and produce production molds for the new co-branded footwear, and to manufacture sample product to be delivered to Ludacris for his personal use.

43.     In the latter part of October 2003, however, Dolce began to work less frequently with Scurlock on the Ludacris Project. Throughout this period, however, Dolce continued to falsely represent to Scurlock that the Ludacris Project was proceeding in accordance with the parties' agreements and plans.

44.     Then, on or about November 11, 2003, Defendants purported to unilaterally terminate the Ludacris Project by referencing (in the bogus payment plan that Kandall submitted to Scurlock), their intention to proceed with Ludacris branded footwear without the use of any of the TROOP Trademarks and without the participation of ICB. Defendants also falsely indicated

10

in the November 11, 2003 payment plan that they would repay ICB the $62,500, ICB contributed to the Ludacris signing bonus.

45.     In attempting to justify their decision, Defendants represented to ICB that the Ludacris representatives had learned of certain disturbing rumors concerning the history of the TROOP brand, which rumors were false, and did not wish to proceed with the project if the TROOP Trademarks and ICB continued to be involved.

46.     That representation was false. The Ludacris representatives had not insisted, or even suggested, that ICB and the TROOP brand be excluded from the Ludacris Project. Rather, Defendants advised the Ludacris representatives that they were not interested in producing Ludacris' branded footwear if such footwear also displayed the TROOP brand.

47.     Similarly, Defendants' representation that they intended to repay ICB the $62,500 it paid in consideration for the Ludacris Project was false. Defendants never intended to repay ICB the money. Nor did Defendants intend to pay Plaintiff for the TROOP/Ludacris production molds and samples manufactured at Dolce's request and to his specifications.

48.     Rather, Defendants, including Dolce, made the false representations concerning the withdrawal from the Ludacris Project and their intent to repay ICB the $62,500 in order to induce ICB to forfeit its valuable rights to participate in the Ludacris Project and to enjoy the benefits thereof.

## MULTIPLE BRACHES OF THE TROOP LICENSE

49.     At the same time, Defendants were misleading Plaintiff with respect to their intentions to pay for the Licensed Product and to develop a co-branded TROOP/Ludacris line of footwear, Sole City was ignoring its obligations under the TROOP License, and committed

multiple breaches thereof, including failing to submit sales reports and make any royalty payments.

50.    Accordingly, On March 24, 2004, Plaintiff terminated the TROOP License pursuant to Section 10.1, subsections (a), (e), and (f) on the grounds of Sole City's various breaches, as well as on the ground that Sole City and the individual Defendants knowingly made false and misleading statements intended to induce ICB US to forestall efforts to enforce the royalty and other provisions of the License.

## FIRST CLAIM FOR RELIEF
### Breach of Contract Against Defendants Sole City and Safdeye

51.    Plaintiff repeats each and every allegation set forth in paragraphs 1 through 50 above, as if fully set forth herein.

52.    Sole City is run for the benefit, and as an alter ego, of Safdeye.  Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

53.    Safdeye has used Sole City to orchestrate and perpetrate the fraudulent scheme alleged herein.

54.    A valid contract existed between Plaintiff and Sole City pursuant to which Sole City agreed and was obligated to pay Plaintiff for Licensed Products manufactured at the request of, and shipped to, Sole City.

55.    A valid contract existed between Plaintiff and Sole City pursuant to which Sole City agreed and was obligated to pay Plaintiff for the production molds used to manufacture the Licensed Products.

12

56.    Sole City has breached the contracts with Plaintiff by failing and refusing to pay Plaintiff the agreed upon sums of (i) $1,298,824 for goods sold and delivered, (ii) $34,181 for sample and production molds made with respect to the Licensed Products, and (iii) $25,688 for sample and production molds made with respect to the TROOP/Ludacris product, although demand therefore has been duly made.  Safdeye is also individually liable for such breaches.

57.    Plaintiff has thus been damaged as a result of this breach in the amount of $1,358,693.

## SECOND CLAIM FOR RELIEF
### Accounts Stated Against Defendants Sole City and Safdeye

58.    Plaintiff repeats each and every allegation set forth in paragraphs 1 through 57 above, as if fully set forth herein.

59.    Sole City is run for the benefit, and as an alter ego, of Safdeye.  Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

60.    Safdeye has used Sole City to orchestrate and perpetrate the fraudulent scheme alleged herein.

61.    Plaintiff delivered to Sole City invoices setting forth the sums due to Plaintiff for Licensed Products sold and delivered to Sole City.  No objection was made thereto.

62.    Each of the invoices constitutes an account stated between Plaintiff, on the other hand, and Sole City, on the other, for the goods delivered.  In the final invoice issued in or around November 2003, there was due and owing from Sole City to Plaintiff the sum of $1,298,824.00.  Safdeye is also individually liable for such amount.

63.    Despite demand for payment of outstanding account due to Plaintiff, Sole City and Safdeye have made no payment thereof.

64.    By reason of the foregoing, Plaintiff has been damaged in the amount of $1,298,824.

### THIRD CLAIM FOR RELIEF
#### Fraud Against All Defendants

65.    Plaintiff repeats each and every allegation set forth in paragraphs 1 through 64 above, as if fully set forth herein.

66.    As outlined above, beginning in or about September 2003, Plaintiff was not receiving payment for the outstanding debts incurred by Sole City.

67.    From September 2003 through February 2004, and beyond, Defendants made material misrepresentations to Plaintiff concerning Sole City's intent and ability to make the payments due, which representations Defendants knew to be false when made.

68.    Defendants' misrepresentations were made to benefit all Defendants financially and were knowingly made with the intent to deceive Plaintiff, to forestall Plaintiff from taking action to collect the outstanding debts, and to induce Plaintiff to continue shipping Licensed Products to Defendant Sole City.

69.    Plaintiff was ignorant of the true facts and reasonably relied upon the misrepresentations made by the Defendants to its detriment.

70.    As a result of Defendants' actions, Plaintiff has been damaged in an amount to be proven at trial, but believed to be in excess of $1.4 million.

71.    Defendants' actions were committed with malice and with the intent to defraud. As a result, Defendants are liable to Plaintiff for punitive damages to be determined at trial, but believed to be in excess of $14 million.

14

### FOURTH CLAIM FOR RELIEF
### <u>Negligent Misrepresentation Against Defendants Sole City and Safdeye</u>

72.    Plaintiff repeats each and every allegation set forth in paragraphs 1 through 71 above as if fully set forth herein.

73.    Sole City is run for the benefit, and as an alter ego, of Safdeye. Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

74.    Safdeye has used Sole City to orchestrate and perpetrate the fraudulent scheme alleged herein.

75.    As a result, both Sole City and Safdeye are in privity of contract with Plaintiff.

76.    Defendants negligently or recklessly made statements, as set forth above, concerning facts material to the relationship between Plaintiff and Defendants, which statements Defendants knew or should have known were false. Those misrepresentations were made for all Defendants' financial benefit.

77.    Defendants made the aforementioned misstatements with the intent that Plaintiff rely on them to forestall action to collect the outstanding debt owed to it by Sole City and to continue shipping Licensed Products to Sole City.

78.    Plaintiff was ignorant of the true facts, and reasonably relied upon the misrepresentations made by the Defendants to its detriment. Plaintiff would have ceased shipping additional goods to Sole City and taken action to recover the outstanding debt but for the misstatements by the Defendants.

79.     Defendants had actual knowledge of the wrongfulness of making misstatements and the high probability that injury or damage to Plaintiff would result. Despite that knowledge, Defendants negligently or recklessly pursued that course of conduct.

80.     As a result of Defendants' actions, Plaintiff has been damaged in an amount to be proven at trial, but believed to be in excess of $1.4 million.

### FIFTH CLAIM FOR RELIEF
### Unjust Enrichment Against Defendants Sole City and Safdeye

81.     Plaintiff repeats each and every allegation set forth in paragraphs 1 through 80 above as if fully set forth herein.

82.     Sole City is run for the benefit, and as an alter ego, of Safdeye.  Safdeye has complete dominion and control over Sole City, ignores Sole City's corporate form, and operates the enterprise for his own personal benefit and for the personal benefit of his family.

83.     Safdeye has used Sole City to orchestrate and perpetrate the fraudulent scheme alleged herein.

84.     By wrongfully refusing to pay for goods ordered and accepted from Plaintiff, which goods were sold by Sole City for profit, Sole City and Safdeye were unjustly enriched.

85.     As a result, Plaintiff has been damaged in an amount to be proven at trial, but believed to be in excess of $1.4 million.

WHEREFORE, Plaintiff demands judgment as follows:

1.     On the first claim for relief for breach of contract that Plaintiff be awarded the amount of $1,358,693 plus interest thereon;

2.     On the second claim for relief for accounts stated that Plaintiff be awarded the amount of $1,298,824.00 plus interest thereon;

16

3.    On the third claim for relief for fraud that Plaintiff be awarded an amount to be determined at trial, but believed to be in excess of $1.4 million;

4.    On the fourth claim for relief for negligent misrepresentation that Plaintiff be awarded an amount to be determined at trial, but believed to be in excess of $1.4 million;

5.    On the fifth claim for relief for unjust enrichment that Plaintiff be awarded an amount to be determined at trial, but believed to be in excess of $1.4 million;

6.    During the pendency of this action, enjoining and restraining Defendants from transferring, encumbering and/or otherwise disposing of the misappropriated monies described above;

7.    Awarding Plaintiff its other and further damages as a result of Defendants' wrongful acts and directing that these damages be trebled since Defendants' actions were willful;

8.    Awarding Plaintiff its costs and reasonable attorneys' fees and expenses, together with pre-judgment interest;

9.    Awarding Plaintiff punitive damages in amount to be determined at trial, but believed to be in excess of $14 million;

10.    That the Court grants such other and further relief as may be just and proper.

Plaintiff demands a trial by jury as to all issues to be decided in this matter.

Dated: New York, New York
        April 15, 2004

                                                GURSKY & PARTNERS, LLP
                                                Attorneys for Plaintiff


By: _____
                                                Ira S. Sacks (IS 2861)
                                                Esther S. Trakinski (ET 7791)
                                                1350 Broadway, 11th Floor
                                                New York, NY 10018
                                                (212) 904-1234

17